# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | |
| | § | **Case Number: H-11-679-S** |
| **MARCUS ROSEMOND TARPLEY**, | § | |
| aka "D" | § | |
| **PATRICK WAYNE SIMMONS**, | § | |
| aka "Yung OG" | § | |
| **ANTHONY DEMONDE NOWLIN**, | § | |
| **ALONZO HORACE HARRIS,** | § | |
| aka "Lonnie Mac" | § | |
| **HAKIM IBN AHMAD,** | § | |
| **REGINALD MOSLEY,** | § | |
| aka "Reggo | § | |
| **MARK  ERIC  SIMPSON,** | § | |
| aka "Big E" | § | |
| aka "Fatboy" | § | |
| **SHELTON MCGOWEN**, and | § | |
| **DERRICK WILLIAMS** | § | |

## UNITED STATES RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS EVIDENCE FROM THE SEARCH OF A VEHICLE

**TO THE HONORABLE JUDGE:**

NOW COMES The United States of America, by and through the United States Attorney for the Southern District of Texas, Kenneth Magidson, and Assistant United States Attorneys, Kebharu Smith and Suzanne Elmilady, and files this Response to Defendants' Motion to Suppress.   In support thereof the

1

Government would show as follows:

I.

Prior to the defendants' arrest, agents and officers assigned to the Federal Bureau of Investigation (FBI) Bank Robbery Task Force, investigated a series of violent takeover style bank robberies that were executed inside of area grocery stores.  The manner and means by which the robberies were committed were similar, suggesting that they were executed by a single organized group. Throughout the course of the investigations, agents and officers learned that stolen vehicles were used to transport the suspects who entered the banks to and from the grocery store during bank robberies.  On every occasion, the stolen vehicle, which was typically a Dodge product, was abandoned a short distance from the bank.  At several of the scenes, witnesses reported seeing suspects abandon the stolen car and enter a second car, commonly referred to as a "clean car"[1].  Witnesses consistently reported that the "clean cars" used by this criminal organization were dark colored, high-end vehicles bearing paper license plates.

On September 15, 2011, agents and officers assigned to the task force received information that a suspicious Dodge Intrepid had been located in an

---

[1] A "clean car" is a vehicle that allows safe passage away from the scene of a robbery due to its apparent lack of involvement.  In essence the robbers use another vehicle immediately after the robbery which is later disposed of and then make their ultimate escape in the clean car.

apartment complex in south Houston.  Earlier that day, a witness observed two black males, wearing black hooded sweatshirts, park the vehicle in the apartment complex parking lot.  After parking the vehicle, the two suspicious males were picked up by an individual driving a black vehicle bearing paper license plates. The witness found the activity to be suspicious since the individuals were wearing hooded sweatshirts when the outside air temperature was near one hundred degrees.  A records check of the Intrepid revealed that the vehicle had been reported as stolen from a location in north Houston.  The apartment complex is located approximately two blocks from a Kroger grocery store, which is located at 16400 El Camino Real, Houston, Texas.  There is an Associated Credit Union (ACU), which is ensured by the National Credit Union Administration, located inside of the grocery store (herein referred to as BANK).  Based on the facts surrounding the discovery of the vehicle and close proximity to the BANK, combined with the fact that agents and officers knew that the suspected serial bank robbers were from North Houston with no known employment or ties to south Houston, members of the task force believed that the stolen vehicle was pre-positioned for a future bank robbery of the BANK.  Surveillance was subsequently maintained on the stolen vehicle, as well as in and around the BANK.

On the morning of September 16, 2011, at around 8:20 a.m., before the

3

credit union opened, agents observed three vehicles approach the parked stolen Intrepid – a black Altima, a black BMW wagon with paper plates, and a black Infiniti.   Several black males exited the three vehicles and entered the stolen Intrepid.  Shortly thereafter, all four vehicles departed the complex.  Surveillance was maintained on the vehicles as they drove away.

The Intrepid arrived at a parking lot approximately 150 yards from the BANK.  Agents and officers observed the Altima, Infiniti, and BMW travel to various locations within a one block radius of the BANK.  The vehicles remained stationary for a brief period of time and it appeared that the drivers did not exit the vehicles.  Based on their training and experience, agents and officers believed the occupants of the vehicles were "casing" the area around the BANK, looking for escape routes, locations of where to pre-position the "clean car", and looking for the presence of law enforcement in the area.

At around 9:00 a.m., as the bank opened, agents saw an individual, later identified as Shelton McGowen, exit the black Altima and walk into the  Kroger grocery store that housed the Associated Credit Union at 16400 El Camino Real, Houston, Texas.   Before McGowen entered the grocery store, Agents pre-positioned a plainclothes agent inside of the store for the dual purpose of observing

the behavior of this crew and preventing a bank robbery.[2] While inside the bank, the plainclothes agent observed McGowen.  The agent saw McGowen walk past the credit union twice in a suspicious manner, then exit.  Agents knew through previous robberies of banks in grocery stores that this crew would send one of their crew members inside of the grocery store for the purpose of determining if the BANK was open, how many employees were on duty, the layout of the BANK and if any armed security guards were present.  Agents believed that from the "totality of those circumstances", McGowen entered the grocery store for the sole purpose of "casing" out the credit union.

After McGowen exited the grocery store, he got back into the black Altima and returned to the apartment complex's parking lot, joined by the other vehicles that met there earlier.  Once all the vehicles returned to the apartment complex, the individuals parked and exited the stolen Dodge Intrepid, got into the other three vehicles, and exited the apartment complex.  Agents and officers observed the three vehicles travel north on I-45 in tandem.  Based on their observations and the actions of the suspects at the apartment complex and near the BANK, agents

---

[2] On August 4, 2011, a Wells Fargo Bank inside of a Randall's Grocery Store in Sugar Land was robbed and an off duty Harris County Sheriff's Deputy was shot during the robbery.  The August 4, 2011 robbery is alleged in the indictment as Count 17.

suspected that one of the suspects may have noticed the FBI surveillance[3].  As a result, agents followed the vehicles northbound on I-45 and stopped one of the vehicles, the black BMW, on the feeder road alongside the highway in order to investigate both the unauthorized use of the stolen vehicle and the suspicious behavior in and surrounding the credit union in the Kroger.

During the stop, agents identified the driver of the BMW as Hakim Ahmad and the passenger as Shelton McGowen.  Believing that there may have been evidence of criminal activity in the vehicle, the agents searched the vehicle. During the search of the BMW agents found a pair of gloves, a black t-shirt, and two black do-rags in plain view.

While some agents had the BMW and its occupants detained, other agents stopped the black Altima.  Agents identified the driver of the black Altima as Anthony Nowlin.  Marcus Tarpley, Reginald Mosley, and Derrick Williams were identified as passengers in the black Altima.  Upon searching the Altima, agents found gloves, sweatshirts, and a phone with a police scanner application.  The phone was connected to the speakers in a manner that allowed the occupants to monitor police radio traffic.   Also, inside of the Altima, agents identified property

---

[3] On the morning of the arrest, FBI surveillance consisted of numerous unmarked vehicles, along with marked units from the Houston Police Department, Harris County Sheriff's Office, and FBI SWAT.

that belonged to the owner of the stolen Dodge Intrepid.

During his detention, Marcus Tarpley had on multiple layers of clothes and within those layers of clothes, agents found gloves and a bank deposit bag.

Although no weapons were found, agents and officers believe the suspects were armed and that the weapons were disposed of prior to the initiation of the traffic stops.  The traffic stops occurred during rush hour traffic on and near a major interstate.  The execution of the traffic stops on the feeder road and highway created a substantial traffic delay.  Marked patrol units from the Houston Police Department (HPD) assisted in directing traffic.  A HPD officer was flagged down by the driver of a vehicle stuck in traffic.  The witness advised that he saw two guns at a stop sign near where the vehicles were stopped.  Prior to the traffic stop, agents and officers observed the black Altima exit the interstate and execute a u-turn underneath I-45.  Agents observed the vehicle in the general area were the witness observed the guns prior to the traffic stop.

## II.

The initial stop of the vehicle does not violate the defendants' Fourth Amendment right because the officers had a reasonable suspicion that criminal activity was afoot.  When the officers pulled the vehicles over they reasonably exercised their authority to stop and preventively detain the individuals in a

vehicle, for the purpose of further investigating the possibility of criminal activity. In <u>Terry v. Ohio</u>, the Supreme Court explained that the Fourth Amendment does not forbid all searches and seizures; it prohibits unreasonable searches and seizures.  392 U.S. 1, 9 (1968).  In <u>Terry</u>, the Court held that temporary detention of an individual by a police officer, for purposes of investigating whether criminal activity is afoot does not violate the Fourth Amendment, where the officer's suspicion of the individual is reasonably based upon specific and articulable facts, which taken together with rational inferences from those facts, would warrant the intrusion.  <u>Id</u>. at 21.  In determining whether officers are justified in making a <u>Terry</u> stop, the court must look at the totality of the circumstances.  <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).

In <u>Cortez</u>, the Court articulated two considerations for a reviewing court to use in determining whether reasonable suspicion in fact existed at the time of the stop.  <u>Id</u>.  First, the assessment of the situation must be based upon all circumstances, including consideration of the objective observations of the police, information from police reports, if available, and consideration of the modes or patterns of operation of particular types of criminals.  <u>Id</u>. at 418.  The court must also understand that from this data, a trained officer draws inferences and makes deductions that might not be obvious to an untrained person.  <u>Id</u>.  Second, in

8

reviewing this information and data known to the officer at the time of detention, the court must decide whether it in fact raises a reasonable suspicion that the particular individual may have been involved in criminal activity.  Id.  The Supreme Court has also noted, "law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity."  United States v. Hensley, 469 U.S. 221, 226 (1985).  "Although stopping a car and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion  .  .  .  may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion.  Id.  This is especially true where the governmental interest in the stop, as noted in Terry, is "that of effective crime prevention and detection."  Terry, 392 U.S. at 22.

In Terry, the police officer observed the defendants engage in a series of acts, which taken together, created a reasonable suspicion that the two men were 'casing a job' and that it was necessary to investigate further.  Id. at 6.  The officer then approached the individuals, identified himself as a police officer and asked for their names.  Id.  At this point, the officer's knowledge was confined to what he had only observed and did not include any information concerning the individuals from any other source.  Id.  The Court held that the officer's observations in

9

addition to his experience as a law enforcement officer amounted to reasonable suspicion that the defendants' actions warranted further investigation.  Id.

Similar to Terry, in this case FBI agents observed not only the suspicious activity of the defendants on the morning September 16, 2011, but the agents were also aware of the distinct patterns of behavior and modes of operation from previous surveillance and investigation of the defendants charged in this indictment. The agents knew that stolen Dodge vehicles were used in committing previous bank robberies, that the target of the robberies were banks located inside grocery stores, and that the suspects wore black hooded sweatshirts during the commission of prior bank robberies.  On the day of the stop in question, agents were made aware of the location of a stolen Dodge Intrepid, received information from a witness that she saw several men in black hooded sweatshirts getting in and out of the Intrepid, observed the Intrepid and other vehicles drive together to a Kroger grocery store where a bank was located, watched McGowen go in and out of the store as though he was "casing" it, and saw the vehicles retreat back to the original meeting spot where the individuals again interacted with one another before proceeding back out onto the highway.  These specific and articulable observations of FBI agents, viewed as a whole in light of the circumstances of the situation, meet the standard of reasonable suspicion as established by the Court in

10

<u>Terry</u>.  The officers had reasonable suspicion that the defendants were engaged in or about to engage in criminal activity and therefore lawfully stopped and temporarily detained the individuals in the vehicle without violating the defendants' Fourth Amendment rights.

III.

After the vehicle was lawfully stopped, the agents were authorized to take steps that were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.  This includes the search of the vehicle for possible weapons, evidence of criminal activity, and evidence revealed in plain view.  "It is well established that warrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause."  <u>United States v. Seals</u>, 987 F. 2d 1101, 1107 (5th Cir. 1993).  "Under the automobile exception to the warrant requirement, officers may conduct a search if they have probable cause to believe that the vehicle contains contraband or evidence of a crime."  <u>United States v. Buchner</u>, 7 F.3d 1149,1154 (5th Cir. 1993); *see also* <u>Maryland v. Dyson</u>, 527 U.S. 465, 467 (1999).  "Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed."  <u>United States v. Carillo – Morales</u>, 27 F. 3d 1054,

11

1062 (5th Cir. 1994).  "Probable cause is determined by examining the totality of the circumstances."  <u>Illinois v. Gates</u>, 462 U.S. 213, 230-231 (1983).  When an officer obtains probable cause to search a vehicle, then probable cause exists to search all compartments and containers within the vehicle. <u>United States v. Seals</u>, 987 F.2d at 1105.

In <u>United States v. Fields</u>, the Fifth Circuit Court found that where an officer had probable cause, established by the totality of the circumstances, to believe that the defendant was engaged in selling illegal narcotics the stop and subsequent search of the defendant's vehicle was lawful under the automobile exception.  456 F.3d 519, 523 (2006).  In <u>Fields</u>, the officer received information from a source that the defendant was engaged in selling drugs.  <u>Id</u>. Upon receiving this information, officers maintained visual surveillance of Fields for nearly an hour. <u>Id</u>.  During surveillance, the officers observed activity that they believed, through their training and experience, was associated with drug transactions.  <u>Id</u>. Subsequent to their observations officers stopped the defendant and searched his vehicle for contraband and evidence relating to criminal activity.  <u>Id</u>. at 524.  The Court held that the search of the defendant's vehicle was lawful under the automobile exception because the "events prior to the search, taken together, amount[ed] to probable cause."  <u>Id</u>.  The Court also noted, "decisions applying the

12

totality of the circumstances analysis have consistently recognized the value of corroboration of details of an informant's tip by independent police work." Id.; (quoting United States v. Vega, 221 F.3d 789, 799 (5th Cir. 2000)).

Applying the holding and rationale of the Fifth Circuit Court in Fields to the facts of this case, the agents had probable cause, based on the totality of the circumstances to search the vehicle under the automobile exception. Similar to the facts of Fields, the agents received information from a witness that she saw several men in black hooded sweatshirts getting in and out of the stolen Dodge Intrepid, found parked in the apartment complex parking lot. Upon receiving this information, the agents continued surveillance of the vehicle, as well as the additional vehicles brought to the apartment, by the defendant and others in black hooded sweatshirts. During the surveillance the agents observed the defendant engage in what they believed to be suspicious activity, based on their experience and knowledge of the on-going investigation of the previous bank robberies, associated with 'casing a bank' for purposes of robbing it. Following the law and reasoning set forth by the Court in Fields, the agents had probable cause to search the vehicle containing the defendant under the automobile exception. The stop and subsequent warrantless search of the BMW that the defendant was a passenger in did not violate the defendant's Fourth Amendment rights and evidence gained

13

through the search is admissible.

## IV.

The officers initial <u>Terry</u> stop and subsequent search of the vehicle in which the defendant was riding in was lawful, regardless of whether or not a warrant was issued.  Under the <u>Terry</u> doctrine and the automobile exception, the agents did not need a warrant to stop or search the vehicle.  In demonstrating that a proper warrant exception applies to both the stop and search of the vehicle, the evidence obtained may be admitted against all the defendants in this case.  <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).

For these reasons, the United States respectfully request the defendants' motions to suppress the stop and search thereafter be denied.

14

Respectfully submitted,
KENNETH MAGIDSON
United States Attorney


By:   __/s/ Kebharu Smith_____
KEBHARU SMITH
Assistant United States Attorney

By:   __/s/_Suzanne Elmilady_____
SUZANNE ELMILADY
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I  hereby certify that a true and correct copy of the Government's Response to Defendants' Motion to Suppress was e-mailed to counsels for the defendants and filed via ECF, on  December 22, 2011.

/s/    Kebharu Smith_____
KEBHARU SMITH
Assistant United States Attorney

16